MARWELL CONSTRUCTION, INC., Foster & Saunders, Inc., and General Accident Fire & Life Assurance Corporation, Ltd., Appellants,

v.

UNDERWRITERS AT LLOYD'S, LONDON, General Insurance Company of America, Al Renk d/b/a Al Renk & Sons Trucking, and Lyman Woods, Appellees.

GENERAL INSURANCE COMPANY OF AMERICA, Appellant,

v.

GENERAL ACCIDENT FIRE & LIFE AS-SURANCE CORPORATION, Ltd., Appellee.

Nos. 999, 998.

Supreme Court of Alaska.

Feb. 20, 1970.

James J. Delaney, Jr., of Delaney, Wiles, Moore & Hayes, Anchorage, for Marwell Construction, Inc., and others.

Robert C. Erwin, of Hughes, Thorsness, Lowe, Gantz & Clark, and Arthur D. Talbot, Anchorage, for General Insurance Company of America and Underwriters at Lloyd's, London.

Before DIMOND, RABINOWITZ and CONNOR, JJ., and LEWIS, Superior Court Judge.

## OPINION

CONNOR, Justice.

This case is nearly as old as the judicial system of the State of Alaska. It presents for decision as many arcana of insurance law as counsel have been able to elaborate and preserve for appeal in nearly ten years of litigation. Before we enter this legal phantasmagoria, reminiscent at times of Charles Dickens' *Bleak House,* we must attempt to set forth a skeleton outline of the factual setting from which emerges a semantic war of nerves. As Judge Brown has noted in a similar context:

"On facts, strikingly simple, neither complex nor conflicting, we have again the problem of an Insurer who has written the policy and taken the Assured's premium urging him to go elsewhere, tentatively if not finally, because another insurer is, or ought to, or may be, liable for the whole, half, or part a loaf. In the process the moving Insurer generally garbs itself in the appealing robes of some assured so that, casting itself in a strange role, it asserts what it so often denied that the policy should be liberally construed and, by a bare toe hold manages to make itself enough of a party to force a construction of another contract made by another insurer with another assured and which, under no circumstance, was made for its benefit.

"So it is here. Coming as it does the accident and the assureds seem all but forgotten as the two Insurers match clause against clause, coverage against exclusion, claim against denial, in this battle between fortuitous adversaries." American Fidelity & Casualty Co. v. St. Paul-Mercury Indemnity Co., 248 F.2d 509 (5th Cir. 1957), at 510–511. (Citations omitted.)

This is an appeal by Marwell Construction, Inc., Foster & Saunders, Inc., and General Accident Fire & Life Assurance Corporation, Ltd., from a declaratory judgment entered by the superior court April 10, 1968.

General Insurance Company of America, one of the appellees herein, has also appealed and, therefore, the two cases will be considered together.

The appeal has its roots in a personal injury sustained by Lyman Woods at the railroad siding at Moose Pass, Alaska, on June 8, 1959. Woods was employed as a truck driver by Al Renk & Sons Trucking of Anchorage and was dispatched with his truck to pick up steel rods and transport them from the siding at Moose Pass to the Cooper Lake Hydroelectric project

being constructed by Marwell Construction, Inc., and Foster & Saunders, Inc., as a joint venture; Marwell Construction, Inc., and Foster & Saunders, Inc., being hereinafter called Marwell.

Mr. Renk testified in the trial below that the agreement with Marwell provided that the latter was to have a crane and a crane operator at the loading place together with a crew. The crane and its operator were supplied but not the crew. It was Wells, employed by Marwell to oversee the construction work and act as a project manager, who dispatched the crane and its operator, Windle. Nevertheless, Woods, Les Crump, another Renk employee who had also brought up a truck, and George Windle, the crane operator, proceeded to load the rods from the siding onto the trucks. While Windle, Crump, and Woods were loading one of the trucks, a bundle of rods which had been rotated onto the truck slipped, knocking Woods off the truck and causing him severe injury to his leg.

Woods filed a complaint in a personal injury action against Marwell on April 22, 1960, which was amended three times: on August 11, 1961; on November 20, 1961; and on December 1, 1961.

Al Renk & Sons had insurance policies with General Insurance Company of America (hereinafter called General Insurance) and the Underwriters at Lloyd's, London (hereinafter called Lloyd's). Marwell was insured by General Accident Fire & Life Assurance Corporation, Ltd. (hereinafter called General Accident). Marwell's defense was tendered to General Insurance, who refused; and on April 17, 1961, the declaratory judgment action was filed.

On December 11, 1961, the date set for trial of Woods' case, Marwell confessed judgment in the amount of $80,000. The judgment was paid by General Accident, which received an assignment of Marwell's rights against General Insurance and Lloyd's.

General Accident then proceeded with the declaratory judgment action to obtain reimbursement from General Insurance and Lloyd's for payment of the settlement. General Insurance and Lloyd's contended that their refusal to participate in the defense and settlement of the personal injury claim was justified on the ground that their policies did not provide coverage for the accident in question.

On November 3, 1961, General Accident moved for summary judgment. The motion was denied. General Accident later moved for partial summary judgment on the ground that under the decision of Theodore v. Zurich General Accident & Insurance Co., 364 P.2d 51 (Alaska 1961), the issue of Windle's negligence was closed and that the only issues to be litigated were those of coverage. The court denied the motion because it felt that the Theodore v. Zurich holding should not be extended beyond the facts of that case.

The declaratory judgment action proceeded to trial and, over the objection of appellants, the jury was impaneled. After the submission of the evidence the following special verdicts were returned:

1. Windle, the crane operator, was negligent and his negligence was the proximate cause of the injuries to Woods.

2. If the personal injury action had gone to trial, there was a reasonable probability that the jury would have found the same as in No. 1, above.

3. It was not a fact that an agent of Marwell agreed with Renk to load the steel at Moose Pass and supply a crane and crane operator but negligently failed to do so.

4. Wells, Marwell's project manager, did not fail to dispatch an adequate crane.

5. Wells failed to dispatch a qualified and competent crane operator, and his failure constituted negligence and was a proximate cause of Woods' injury.

6. Wells failed to dispatch an adequate crew to load the steel and his failure

constituted negligence and a proximate cause of the injury.

7. Wells did not fail to properly instruct the crane operator as to what he was to do at Moose Pass.

8. The injuries to Woods arose out of the loading of an Al Renk & Sons truck at Moose Pass.

9. The jury also found that Woods was contributorily negligent and assumed the risk of injury.

In two memorandum decisions, the court made the following rulings:

1. The employee and workmen's compensation exclusions of the General Insurance policy (exclusions *d* and *e*) do not apply to this injury.

2. Marwell, Foster & Saunders are liable for the negligence of Windle and Wells under the doctrine of respondeat superior.

3. Marwell, Foster & Saunders' liability is not covered by Coverage B of the General Accident policy because exclusion *c* provides that Coverage B shall not apply if the injury occurs away from the premises of the joint venture.

4. Coverage A (Bodily Injury Liability-Automobile) of the General Accident policy covered Marwell's liability.

5. Wells was not an "executive officer" and therefore was not covered by Clause III of the General Accident policy.

6. Under a ruling by memorandum decision of June 12, 1967, at page 525, Marwell and Windle were omnibus insureds under the General Insurance policy, Item 6, Coverage A, Clause III(a).

7. Wells was not an omnibus insured under the General Insurance policy because his conduct was too remote in time and place from the accident.

8. The complete indemnity theory under Maryland Cas. Co. v. Employers Mut. Liab. Co., 208 F.2d 731 (2d Cir. 1953),

as advanced by General Accident does not fit the facts of this case. Therefore it was necessary to rule on the basis of the "other insurance" provisions of the policies.

9. The coverage furnished by General Accident was not excess over that furnished by General Insurance.

10. The settlement and expense costs should be prorated under the proration clauses of the "other insurance" provisions of the General Accident and General Insurance policies. The limit of General Accident's policy was $100,000 and General Insurance's limit was $25,000. Therefore, General Accident would bear $64,000 of the settlement and $10,612 of the total defense costs of $13,266.75. General Insurance would be liable to General Accident for the remainder.

11. General Accident was entitled to recover nothing from Lloyd's who furnished excess insurance above the primary coverage of the other two policies.

12. General Accident should recover $6,000 in attorneys' fees from General Insurance, and Lloyd's should recover $1,000 attorneys' fees from General Accident.

The main issues presented in General Accident's appeal are the following:

1. Did the court err in not allowing General Accident complete indemnity against General Insurance and Lloyd's under the theory of Maryland Casualty Co. v. Employers Mutual Liability Insurance Co., 208 F.2d 731 (2d Cir. 1953)?

2. Did the court err in not finding that under the doctrine of Theodore v. Zurich General Accident & Liability Insurance Co., 364 P.2d 51 (Alaska 1961), General Insurance's breach of its promise to defend rendered it and Lloyd's liable in the amount of the judgment and costs to Marwell and its assignee, General Accident?

3. Did the court err in ruling that General Accident's coverage was not excess

over that provided by General Insurance and Lloyd's?

4. Did the court err in holding that Lloyd's coverage was excess to that of General Accident?

The main issues presented in the appeal by General Insurance are:

1. Whether under the employees' and workmen's compensation provisos, exclusions (d) and (e) of its policy, General Insurance did not provide coverage for the injury to Woods.

2. Whether the injury was covered by the "loading-unloading" provisions of the General Insurance policy.

3. Whether General Accident's policy covered Wells as an "executive officer" under Coverage B.

4. Whether a portion of General Accident's costs of defending Marwell should have been recovered from General Insurance.

5. Whether the trial court properly prorated the loss and costs of defense between the parties.

## THE COVERAGE OF GENERAL INSURANCE'S POLICY

General Insurance contests the trial court's holding that the injury to Woods was covered by its policy of insurance.

Under its basic automobile coverage, General Insurance agreed

"[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury * * * sustained by any person, arising out of the ownership, maintenance or use of that automobile."

Use of the automobile is defined to include "the loading and unloading thereof." The policy defines the "insured" to include the named insured and

"any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the

named insured * * * or with [his] permission * * *."

The jury returned special verdicts finding:

1. That the injury to Woods arose out of the loading of the truck;

2. The injury was proximately caused by the negligence of Windle, the crane operator; and

3. The injury was proximately caused by Wells' (Marwell's job supervisor) failure to dispatch to the unloading site a competent crane operator and a crew adequate to safely effect the unloading.

The trial court held Windle to be an "omnibus insured" under the policy and Marwell, which was vicariously liable for Windle's negligence, also to be an "omnibus insured." Wells was held not to be an additional insured because his negligent conduct was "too remote in time and place" to be connected with the use of the Renk truck.

General Insurance argues that, despite the fact that the injury occurred during the loading process, the "efficient cause" of the accident was Wells' negligence and not the use of the truck. Therefore, the accident would be outside the risk underwritten by General Insurance.

It is the overwhelming weight of authority that the omnibus clause, in conjunction with the loading and unloading clause, extends coverage to any person using the truck with the owner's (named insured's) permission. General Insurance Co. v. Saskatchewan Government Insurance Office, 238 Or. 8, 391 P.2d 616 (1964).

General Insurance cites in support of its "efficient cause" argument Cosmopolitan Mutual Insurance Co. v. Baltimore & Ohio R.R. Co., 18 A.D.2d 460, 240 N.Y.S.2d 88 (1963), and Industrial Underwriters Insurance Co. v. P & A Construction Co., 382 F. 2d 313 (10th Cir. 1967). The *Cosmopolitan* case concerned a defective platform which collapsed when the truck driver stepped onto it while unloading his truck. The

*Industrial Underwriters* case employed an Oklahoma doctrine which restricts coverage where the injury is caused by some independent or intervening cause which is wholly dissociated from the use of the vehicle.

In the case before us the jury's verdict results in there being concurrent causes of the accident: the negligence of Wells conjoining with that of Windle, so neither of the cases cited by General Insurance could be controlling here.

■ The theory of "efficient cause," or "real cause" as it is phrased elsewhere by General Insurance, would be a dangerous and mischievous rule to employ in a case of this kind. We are not determining questions of tort liability. We are interpreting an insurance contract according to the well-known rule that we should give effect to the intentions of the parties as expressed in the language of the agreement. There must be a causal relationship between the insured's use, which is the loading operation, and the accident. But it is not necessary that the vehicle or its use be the sole cause of the accident for coverage to be extended. Nor does the existence of other causes of the accident become a magic wand by which to make coverage, which would otherwise be present, somehow disappear. St. Paul Mercury Insurance Co. v. Huitt, 336 F.2d 37 (6th Cir. 1964); Federal Insurance Co. v. Michigan Mutual Liability Co., 277 F.2d 442 (3d Cir. 1960).

In a similar case in which a crane collapsed during the unloading of a truck, causing injury to a bystander, the court observed:

"[T]he parties most likely intended to cover, under the 'loading-unloading' clause, all hazards from initial loading until the goods were unloaded including all incidental and necessary parts of the unloading process; and, thereby, including, * * * the hazard of an injury caused by the use of some device needed in the unloading process." Johnson, Drake & Piper, Inc. v. Liberty Mutual Insurance Co., 258 F.Supp. 603, 610 (D. Minn.1966).

■ We are firmly of the opinion that the injury to Woods came within the coverage of the General Insurance policy.

## EMPLOYEE AND THE WORKMEN'S COMPENSATION EXCLUSIONS

■ General Insurance claims that exclusions (d) and (e) apply to relieve it of any liability for Woods' injury. These two exclusions state that the automobile coverage does not apply:

"(d) under coverage A, to bodily injury to or sickness, disease or death of any employee of the *insured* arising out of and in the course of (1) domestic employment by the insured, if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law, or (2) other employment by the insured; [Emphasis supplied.]

(e) under coverage A to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law; * * * *"

General Insurance claims that in order to give effect to the underwriting intent, the term "the insured" should be construed as if it read "the *named* insured." Thus, the injury to Woods, the employee of the named insured in the General Insurance policy, would be excluded from coverage. This construction is in accord with American Fidelity & Casualty Co. v. St. Paul-Mercury Indemnity Co., 248 F.2d 509 (5th Cir. 1957), in which the court held that the purpose of the exclusions was to eliminate from the coverage of the general liability policy those persons already covered by the named insured's employer's liability insurance, and to prevent the need to pay double premiums for basically the same coverage.

However attractive the reasoning of the *American Fidelity* case, there was no severability of interests clause in the policy construed there. This clause which is con-

tained in the General Insurance policy provides:

"The term 'the insured' is used severally and not collectively, but the inclusion herein of more than one insured shall not operate to increase the limits of the company's liability."

The purpose of the severability of interests clause is well stated in Shelby Mutual Insurance Co. v. Schuitema, 183 So.2d 571 (Fla.App.1966); aff'd 193 So.2d 435. There, the insurance company claimed that it had properly refused to defend the omnibus insured on a claim for injuries to an employee of the named insured caused by employees of the omnibus insured. The exclusions were similar to those in the policy of General Insurance in the case before us. The insurance policy in *Shelby Mutual* included a severability of interests clause. The court affirmed the summary judgment against the insurer and said:

"Under the standard automobile policy in use before 1955 there was a split of authority as to whether coverage was provided under facts similar to the instant case. See Annot., 50 A.L.R.2d 99. In 1955 the insurance underwriters attempted to eliminate the confusion of interpretation then existing by adding the 'severability of interests' clause here involved. It appears to be the virtually unanimous opinion of the legal scholars writing on the subject that the purpose of the addition of the severability of interests clause was to provide coverage under the facts in the instant case. Risjord & Austin, 'Who is the "Insured" Revisited', 28 Ins. Counsel J. 100 (1961); Thomas, The New Standard Automobile Policy; Other Provisions, 393 Ins. L. J. 653 (1955); Brown & Risjord, Loading and Unloading: The Conflict Between Fortuitous Adversaries, 29 Ins. Counsel J. 197 (1962); Breen, The New Automobile Policy, 388 Ins.L.J. 328 (1955). Since the adoption of the severability of interests clause in a policy which would or might apply to several insureds, the term 'the insured', as used in the

exclusions and conditions of the policy, means only the person claiming coverage." 183 So.2d 571, 573.

Judge Brown, who wrote the *American Fidelity* opinion, later noted in a concurring opinion in American Agricultural Chemical Co. v. Tampa Armature Works, Inc., 315 F.2d 856 (5th Cir. 1963) that *American Fidelity* involved no severability of interests clause and that if there had been such a clause in the policy the result would necessarily have been different.

We hold that the term "the insured" in the exclusions refers to the person actually seeking coverage. Since Woods was not Marwell's employee, exclusions (d) and (e) do not apply to relieve General Insurance of its obligations under the policy.

## THE INDEMNITY QUESTION

General Accident claims a right to full reimbursement from General Insurance and Lloyd's on an indemnity theory. General Accident contends that an insurance company which provides coverage to an employer only is entitled to full indemnity from an insurance company that insures both the employer and the negligent employee. This claim is based upon a line of cases which stand for the proposition that an insurer of an employer, which is vicariously liable for the negligent tort of its employee, may assert the employer's indemnity action against the negligent employee and the employee's insurer. Maryland Casualty Co. v. Employers Mutual Liability Co., 208 F.2d 731 (2d Cir. 1953); Pacific Employers Insurance Co. v. Hartford Accident & Indemnity Co., 228 F.2d 365 (9th Cir. 1955). General Accident argues that the case at bar fits the indemnity theory: that General Accident, found to insure, under its automobile coverage, Marwell, which was found to be liable for Woods' injury on the basis of respondeat superior, should be indemnified by General Insurance, which was found to have provided coverage for both Marwell and George Windle, the crane operator whose negligence was a proximate cause of the injury.

We agree with the trial court's conclusion that the indemnity theory does not apply to the present case. Regardless of the questionable validity and desirability of the doctrine allowing a vicariously liable employer an indemnity action against his negligent employee, the indemnity theory cannot logically be applied to a dispute between two insurance companies both of which provide coverage to the negligent employee. 16 Couch on Insurance § 61.142 (2d ed. 1966). The trial court found that General ·Insurance's policy covered both Marwell and Windle and that the General Accident policy covered Marwell. We find that both the General Insurance policy and the General Accident policy by virtue of its automobile provisions—Coverage A—covered Windle.[1]

Because we have found that both General Accident and General Insurance provided coverage, the argument for reimbursement of General Accident on a full indemnity basis must fail under the authorities on which General Accident has relied.

## CONSEQUENCES OF THE FAILURE TO DEFEND BY GENERAL INSURANCE COMPANY

General Accident contends that under the rule of Theodore v. Zurich General Accident & Liability Co., 364 P.2d 51 (Alaska 1961), the declaratory judgment action should have determined only issues of coverage, that General Insurance should have been precluded from raising any issues of negligence, and that the issues of coverage should be decided in its favor.

Theodore v. Zurich was an action by an insured and her judgment creditor against the insurer. Arthur Theodore had been employed by Cordova Cold Storage as a tallyman on one of the company's fishing scows and was drowned after being swept overboard while the ˙scow was anchored three-fourths of a mile from shore. His mother brought an action against Cordova for damages under the Jones Act. Notice was given Zurich General Accident Co., which refused to defend on the ground that the exclusive remedy was under the state workmen's compensation statute for which Zurich provided no coverage. Cordova settled the claim and confessed judgment. Then the action against Zurich was commenced. We held that the judgment in the action against Cordova was binding on Zurich both as to the existence and extent of liability, and that Zurich was precluded from showing that Theodore's exclusive remedy was under the state workmen's compensation statute. The court reasoned that Zurich's policy contained a promise to defend any suit against the insured alleging bodily injury or death under the employer's liability coverage, even if such suit were groundless, false or fraudulent. Since the allegations of the claim against Cordova set forth facts showing an injury within Zurich's coverage, Zurich had a contractual duty to defend which it breached and for which, therefore, it became liable for the amount of the judgment as a natural consequence of its breach. The court concluded that because the interests of Cordova and Zurich were identical at the time of the original claim, there was no reason to place any limitations on Zurich's duty to defend.

The Theodore v. Zurich decision is in line with the widely accepted rule

---

1. The automobile coverage provisions of the General Accident policy are substantially the same as the corresponding provisions in the General Insurance policy. Under these provisions General Accident promised:
"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury * * * sustained by any person, and arising out of the * * * use of any automobile."

Use of the automobile includes "loading and unloading thereof," and a hired automobile is included within the definition of "automobile." The "insured" is defined as the named insured and
"any person while using an owned or hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission * * *."

that where an insurance policy contains a promise to defend the insured against suits alleging injuries within the coverage of the policy, even if the claim be groundless, false or fraudulent, the insurer has a duty to defend the insured from any claim against it alleging an injury within the policy coverage. 50 A.L.R.2d 458. If this contractual duty is breached by a refusal to defend on the grounds that the injury was not actually covered by the policy, the insurer will be liable for at least the costs of defending. 49 A.L.R.2d 694.

Clause II(a) of the General Insurance policy is such a promise to defend the insured. However, the trial court decided that Theodore v. Zurich should not be extended beyond the narrow facts in that case, i. e., the insured, or someone standing in his shoes, suing his own insurer.

General Accident's argument is that since each of Woods' complaint alleges that the injury occured while the named insured's truck was being loaded, General Insurance breached its promise to defend and should, therefore, bear the consequences of the *Zurich* doctrine. That is, the only determinations to be made in the declaratory judgment action would have been whether under Woods' allegations General Insurance covered the injury and whether General Accident was entitled to indemnity.

General Insurance contends that the trial court was correct in holding that Theodore v. Zurich was not intended to apply to a dispute between several insurance companies. This argument may be logical, but the authorities cited by General Insurance [2] deal with an entirely different problem—the interpretation of ambiguous language in insurance policies.

The more cogent argument is that even if Theodore v. Zurich applies to bind the parties to the alleged facts in the original personal injury claim, further factual determinations are necessary to a decision on General Accident's claim for indemnity or contribution. Woods' claim contained allegations that Windle and Marwell were each negligent. If Marwell was directly liable for the injury, rather than under the theory of respondeat superior, the rules regarding indemnity or contribution among joint tort-feasors might have applied.

If Marwell had been found to be directly liable, that would have barred it from seeking indemnity from Windle. General Insurance asserted a right to litigate the questions of what persons were responsible in tort and on what particular legal basis.

Under the second amended complaint in Woods' personal injury action it is not possible to determine whether Marwell would be liable as an active or merely passive tort-feasor, or whether it would be liable only on a respondeat superior basis. In Siebrand v. Eyerly Aircraft Co., 196 F.Supp. 936 (D.C.Or.1961), in a similar situation, the court held:

"The scope of the estoppel created by the judgment in the primary cases embraces all issues *necessarily* determined in the original case. * * * However, it is only those facts *necessarily* litigated and determined against the indemnitor in the former action which would be binding on it in subsequent litigation." 196 F.Supp. at 939.

█ This rule is supported also by such cases as Security Insurance Co. of New Haven v. Johnson, 276 F.2d 182 (10th Cir. 1960), and Crawford v. Pope & Talbot Co., Inc., 206 F.2d 784 (3d Cir. 1953). Even when the parties to a present action are identical to the parties to an earlier action, the decree in the earlier action will not be binding if the decree could have been rendered on two or more grounds

2. Fred Meyer, Inc. v. Central Mut. Ins. Co., 235 F.Supp. 540 (D.C.Or.1964); United States Fidelity & Guaranty Co. v. Western Cas. & Sur. Co., 195 Kan. 603,

408 P.2d 596 (1965); Eastcoast Equip. Co. v. Maryland Cas. Co., 207 Pa.Super. 383, 218 A.2d 91 (1966).

but there is nothing in fact or in the record to show which ground was the basis of the decree. Cochrane v. Cochrane, 303 Mass. 467, 22 N.E.2d 6, 138 A.L.R. 341 (1939). See also the opinion of Mr. Justice Holmes in George A. Fuller Co. v. Otis Elevator Co., 245 U.S. 489, 38 S.Ct. 180, 62 L.Ed. 422 (1918), and Restatement Judgments § 107.

■ Under these persuasive authorities we conclude that General Insurance had a right to litigate the mentioned issues. From this it follows that Theodore v. Zurich General Accident & Liability Insurance Co., supra, does not apply to the circumstances of this case. The trial judge properly refused to enter summary judgment against General Insurance on the basis of the *Zurich* case.

## WAS GENERAL ACCIDENT'S POLICY EXCESS INSURANCE OVER THAT OF GENERAL INSURANCE OR LLOYD'S?

■ The "other insurance" provision of General Accident's policy states:

"14. Other Insurance. If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declaration bears to the total applicable limit of liability of all valid and collectible insurance against such loss; *provided the insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance (1) with respect to loss arising out of the maintenance or use of any hired automobile insured on a cost of hire basis or the use of any non-owned automobile, and (2) disclosed to the company as in effect on the effective date of this policy and upon the basis of which the premium*

*for the insurance under this policy is modified, but in such event the insurance under this policy shall apply only in the amount by which the applicable limit of liability stated in the declarations exceeds the applicable limit of liability of such other insurance."* (Emphasis added.)

The trial judge decided that the two conditions set forth must both be met before General Accident's coverage could be considered excess. He considered this construction correct in light of the conjunctive "and" and because it would avoid what he termed a tortuous construction offered by General Accident.

However, General Accident claims that the two conditions are separate and distinct situations under either of which the policy will be excess, and that to construe it otherwise would rob the provision of any meaning.

General Accident cites numerous cases giving effect to excess provisions so that the insurer of the owner of the vehicle bears the primary obligation. See, for example, American Surety Co. of New York v. Canal Insurance Co., 258 F.2d 934 (4th Cir. 1958); and New Amsterdam Casualty Co. v. Fidelity & Casualty Co. of New York, 400 F.2d 237 (9th Cir. 1968). But as General Insurance points out, these all construe excess provisions which are different in language from those in General Accident's policy, which General Insurance asserts to be at variance with a normal or typical provision.[3]

Confronted with this problem the trial judge made a first-impression interpretation of the General Accident policy language. He stated in his memorandum opinion:

"I think the clause means that if there is other valid and collectible insurance paid for as part of the cost of hire on

---

3. A normal provision is said to be:
 "The insurance under this policy shall be excess insurance over any other valid and collectible insurance available to the insured, either as an insured under

another policy or otherwise." Cosmopolitan Mut. Ins. Co. v. Continental Ins. Co., 28 N.J. 554, 147 A.2d 529, 69 A.L.R.2d 1115 (1959).

a hired automobile, or such insurance provides coverage for a non-owned automobile used by an executive officer of the insured in the business of the insured and the other insurance is disclosed in order to obtain a reduction of premium on the General Accident policy, then the coverage provided by General Accident becomes excess inurance up to policy limits. The amount of other collectible insurance, when ascertained, permits the limitation of General Accident's liability and forms the basis for a reduction in premium. Moreover, the conjunctive AND (emphasis supplied) is used to connect that portion of the clause following (1) with the portion of the clause following (2). The interpretation now contended for by General Accident would compel an application of the disjunctive to the two portions of the clause rendering a meaning entirely different than the literal wording."

We can find no flaw in the reasoning of the trial judge. We conclude that General Accident's policy did not provide excess insurance to that provided by General Insurance.

General Insurance asks that we declare a broad rule requiring proration in all situations in which insurers who both provide coverage have conflicting "other insurance," excess, or no liability clauses in their policies. It is argued that the inertia of the insurance industry in failing to agree on a method of handling claims under these conflicting provisions requires an across-the-board rule of proration, which will stop the flooding of the courts with masses of litigation. It is urged that we should adopt the doctrine of Lamb-Weston, Inc. v. Oregon Automobile Insurance Co., 219 Or. 110, 341 P.2d 110, 76 A.L.R.2d 485 (1959), that all "other insurance" clauses, regardless of their language, will be regarded as mutually repugnant and proration will be ordered in all cases.

The argument is well briefed and very appealing. But, as tempting as it is, we must pass by a ruling on this important question at this time. Our ruling that the

General Accident policy did not provide excess coverage is dispositive of the point on appeal. General Accident has not complained of any use of the Lamb-Weston doctrine, as the trial court found no need to employ it, and General Accident has not, therefore, briefed the question. On a matter of such great importance to the insurance industry we would rather await an occasion when this question is amply briefed by both sides and is squarely before us.

## WAS LLOYD'S POLICY EXCESS OVER GENERAL ACCIDENT'S?

General Accident contends that the court erred in ruling that Lloyd's excess insurance policy did not come into effect because the limit of the General Insurance policy was not exhausted.

The Lloyd's policy contained a conditional provision whereby liability to pay could arise only under the following clause:

"4. ATTACHMENT OF LIABILITY. Liability under this Certificate shall not attach unless and until the Primary Insurers shall have admitted liability for the Primary Limit or Limits, or unless and until the Assured has by final judgment been adjudged to pay a sum which exceeds such Primary Limit or Limits."

Elsewhere in the Lloyd's policy General Insurance is named and defined as primary insurer.

General Accident sets forth four arguments in support of its position that Lloyd's policy should not be excess over General Accident's.

The first argument is that the Lloyd's and General Insurance policies should be considered as one policy except as between these two companies themselves. In support of this position, General Accident cites Fireman's Fund Indemnity Co. v. Prudential Assurance Co., 192 Cal.App.2d 492, 13 Cal.Rptr. 629 (Cal.App.1961). We do not find that case apposite. Fireman's insured the lessee of a vehicle. Maryland Casualty insured the owner, and Prudential's was an excess policy to Maryland's —similar to Lloyd's here. The accident

.was held to be covered by Fireman's and Maryland Casualty. The court held that excess clauses in the "other insurance" provisions of the two primary policies (Fireman's and Maryland's) showed the clear intention that the lessee's policy would be excess over the owner's policy, and therefore there was no proration between these two policies. Maryland paid off to the limits of its policy, and the dispute remaining was between Fireman's and Prudential. Prudential's policy stated that its liability would attach only after the owner's primary insurer had paid the full amount of its "ultimate net loss," which it defined as meaning sums paid in settlement of losses *after* making deductions for "other insurance" whether recoverable or not. Prudential asserted that its liability therefore would not attach until both Fireman's and Maryland had paid the full limits of their policies. The court held this provision to be ambiguous and construed it against Prudential. Then it held that since no contribution could be had from Fireman's, Prudential's liability attached after Maryland had paid the full limits of its policy.

Thus it cannot be said that the case supports the proposition asserted. It concerns mainly the construction of a provision which is substantially different from Lloyd's provision here defining the conditions under which liability attaches.

■ Second, General Accident argues that because Lloyd's policy contained an ICC endorsement pursuant to Section 215 of the Interstate Commerce Commission Act, found in 49 U.S.C. § 315, which requires the filing of policies of insurance in order for a common carrier's certificate to remain in force, the inference should be drawn that Lloyd's policy is primary rather than excess. We are cited to no authority supporting this proposition. We have examined the Act and the required ICC endorsement and find nothing therein which would alter the relationship of the insurers *inter sese* or the risks assumed in each insuring agreement.

The third argument presented by General Accident is stated in its brief as follows:

"An 'excess-excess' clause such as in the Lloyd's policy is in effect a no-liability or escape clause, particularly since it purports to absolve Lloyd's from any liability whether the other insurance is collectible or not."

We assume that this argument refers to the "attachment of liability" clause quoted above coupled with the following provision found in the "definitions" portion of the policy:

"2. ULTIMATE NET LOSS. The words 'ultimate net loss' shall be understood to mean the sums paid in settlement of losses for which the Assured is liable after making deductions for all recoveries, salvages, and other insurances (other than recoveries under the policy/ies of the primary insurers), whether recoverable or not, and shall exclude all expenses and 'Costs.' "

General Accident cites cases holding that where there is an "escape" clause in one policy and an "excess" clause in the other policy, the "excess" clause is to be given effect, thus imposing primary liability upon the insurer whose policy contains the "escape" clause. Continental Casualty Co. v. Curtis Publishing Co., 94 F.2d 710 (3d Cir. 1938); Zurich General Accident & Liability Insurance Co. v. Clamor, 124 F.2d 717 (7th Cir. 1941); Michigan Alkali Co. v. Bankers Indemnity Insurance Co., 103 F.2d 345 (2d Cir. 1939); New Amsterdam Casualty Co. v. Certain Underwriters at Lloyd's, 34 Ill.2d 424, 216 N.E.2d 665 (Ill. 1966); 16 Couch on Insurance § 62.76 (2d ed. 1966).

Taking the *New Amsterdam* case as an example, we find these authorities distinguishable. *New Amsterdam* concerned an action for indemnity by the insurer of a lessee of a rental car against the insurer of the owner.

The lessee's policy covered the accident and contained a provision that the policy

would be in excess to any other policy covering the insured. The owner's policy covered the lessee as an omnibus insured and contained a provision that there would be no liability under the policy if the insured was covered by other insurance. The court found this latter provision to be an escape clause. Following the majority rule, it resolved the conflict in favor of the excess clause and imposed primary liability under the policy containing the escape clause.

But the Lloyd's policy is unlike any of those dealt with in the authorities cited. It contains no clause which invalidates its own coverage in the event that other insurance covers the accident. And while some of the cases cited do concern policies written primarily as excess insurance, none of them are analogous to the case before us. Under Lloyd's policy terms Lloyd's would still have a potential liability to pay in some amount, despite the existence of other insurance. Therefore, we do not find the Lloyd's policy to contain an "escape" clause.

The fourth phalanx of the argument is that the presence of a clause mentioning "other insurance" in both the Lloyd's and General Accident policies renders them both excess insurers between whom the excess loss should be apportioned.

In support of this argument, General Accident cites St. Paul Mercury Insurance Co. v. Underwriters at Lloyds, 365 F.2d 659 (10th Cir. 1966), and Gilkey v. Andrew Weir Insurance Co., 291 F.2d 132 (9th Cir. 1961). The facts of the first cited case are quite similar to those in Fireman's Fund Indemnity Co. v. Prudential Assurance Co., 192 Cal.App.2d 492, 13 Cal.Rptr. 629 (Cal. App.1961), which is discussed in an earlier portion of this opinion. In the St. Paul case the dispute was between the insurer of the employee driver, whose policy contained an excess liability clause, and Lloyd's, who had issued an excess policy to cover the employer and owner of the vehicle involved in the accident. The Lloyd's policy contained the same "ultimate loss" provision as Prudential's policy. There the court held that both policies were excess policies and were on an equal footing. Accordingly, the excess loss was prorated between them.

In the Gilkey case, Lloyd's excess policy had incorporated by reference the "excess insurance" provision of the underlying policy. The dispute between Lloyd's and the other primary policy, which also contained an "excess insurance" clause, was resolved by applying the Lamb-Weston doctrine, as Oregon law had to be applied in this action which was brought under federal diversity provisions.

We do not find these or the other authorities cited by General Accident to be determinative of the question before us. A case which we do find to be dispositive is Liberty Mutual Insurance Co. v. Truck Insurance Exchange, 245 Or. 30, 420 P. 2d 66, (1966), cited by General Insurance and Lloyd's. In that case an employee of a transporter was injured through the negligence of employees of a consignee. The consignee was insured by a general liability carrier, but the consignee also carried a separate policy of excess insurance. Another primary insurer also covered the accident. The court prorated the loss between the two primary insurance carriers under the Lamb-Weston doctrine. But it held that the consignee's excess insurance policy did not require the excess insurer to pay unless the policy of the primary insurer to which it was an excess insurer was first exhausted. It refused to require the insurance company writing the excess policy to contribute in any proration of the loss. The court noted that each of the primary insurers would have been liable for 100% of the loss if it were not for the presence of the other insurer in the case. Therefore, no injustice could be done by allowing the excess insurer to be sheltered by the terms of the policy it had written.

We have already held that General Accident was not an excess insurer and that proration of the loss between it and General Insurance was proper. We are not

presented with a dispute between two insurers, each of whom can be held to be excess insurers. We are unable to adopt the argument put forth by General Accident.

In summary, Lloyd's has no obligation to pay any part of the loss.

## APPLICABILITY OF COVERAGE B IN THE GENERAL ACCIDENT POLICY

 General Insurance argues that the General Accident policy gave coverage for the acts of Wells, either as an executive officer or as a general manager. If this is so, then the amount of insurance provided by the General Accident policy would be $200,000 instead of $100,000. This would mean that the proration formula used by the trial court was wrong, and that it ought to be altered to the benefit of General Insurancec.

Coverage B would provide liability for bodily injury effected except by automobile. For the purposes of Coverage B the "insured" is defined as follows:.

"Any executive officer, director, or stockholder thereof while acting within the scope of his duties as such, and any organization or proprietor with respect to real estate management for the named insured, and if the named insured. is a partnership the unqualified word insured also includes any partner therein but only with respect to his liability as such. * * *"

But an exclusion relating to Coverage B states that the policy does not apply:

"(c) under Coverages B and D, except with respect to operations performed by independent contractors and except with respect to liability of others assumed by the insured under the contract, to the ownership, maintenance, operation, use, loading and unloading of (1) watercraft, if the accident occurs away from the premises owned by, rented to or controlled by the named insured, ex-

cept insofar as this part of this exclusion is stated in the declarations to be inapplicable, (2) automobiles, if the accident occurs away from such premises or the ways immediately adjoining, or (3) aircraft * * *."

The trial court reasoned that because the injury to Woods occurred at the railroad siding of the Alaska Railroad at Moose Pass, some miles away from the construction site which was under the control of Marwell, the exclusion had to apply and General Accident was not liable under Coverage B. In support of this conclusion the trial court relied upon Sam Finley, Inc. v. Standard Accident Insurance Co., 41 Tenn.App. 417, 295 S.W.2d 819 (Tenn.App.1956), and Employers Mutual Liability Insurance Co. v. Pacific Indemnity Co., 167 Cal.App.2d 369, 334 P.2d 658 (Cal.App.1959). General Accident has also cited us to Continental Casualty Company v. Zurich Insurance Co., 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455 (Cal. 1961). It is noteworthy that General Insurance has been unable to provide any authorities which would construe the exclusion to be inapplicable in the circumstances of this case.

General Insurance argues that the negligence of Wells took place at the Cooper Lake project site and, therefore, the exclusion is inapplicable. For this reason, General Insurance argues that we must determine whether Wells was an "executive officer" so as to bring him under Coverage B. But this overlooks the basic language of the exclusion. The exclusion says nothing about negligence occurring on or off the job site, it refers to an *accident* which occurs away from the premises. This being so, it seems to us immaterial at what geographic location Wells' cerebrations, which constituted negligence, may have occurred. Happily, we do not have occasion to explore the well-briefed, but thorny, problem of whether Wells was an "executive officer" of a joint venture in which the venturers were in turn corporations.

## THE PRORATION OF DE-
## FENSE COSTS

General Insurance argues that the trial court erred in prorating costs of defense between it and General Accident.

Part of the argument is that there was coverage for Wells, that General Accident had an absolute obligation to defend him, and that the entire cost of defense should, therefore, have been borne by General Accident. Our ruling elsewhere in this opinion, that there was no coverage for Wells, disposes of this point.

In some jurisdictions the duty to defend is regarded as one to furnish services to the insured and, therefore, it is a duty personal to each insurer. As a result, when there is concurrent coverage and one insurer has denied liability and refused to defend, the other insurer cannot require contribution to the costs of providing a defense to its assured. In other words, the duty to defend is viewed as independent of and severable from the indemnity provisions of the insuring agreement. Continental Casualty Co. v. Curtis Publishing Co., 94 F.2d 710 (3d Cir. 1938).

We do not think the matter should turn upon the fiction that the insurance policy is a contract for the rendition of personal services in the usual sense. Realistically the services of providing a defense are for the benefit of both the assured and the insurer.

■ Of greater importance are the consequences which would follow from such a rule. The insurer who wrongfully breached its duty to defend would be awarded a bonus for having done so, by having another company bear the entire cost. This would make it attractive for insurance companies to disavow responsibilities, and to find reasons, in the inevitable amibiguity of the fine print of their policies, to deny coverage to the insured. This is contrary to the important principle that the policy should be construed liberally to provide coverage to the insured.

■ A breach of the obligation to defend should not be encouraged by a rule under which there is everything to gain and nothing to lose. We employ the principle of equitable subrogation and rule that the defense costs must be shared pro rata between concurrent insurers in proportion to the amounts of coverage they have provided. This rule is employed by what we view to be the better reasoned authorities. Continental Casualty Co. v. Zurich Insurance Co., 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455 (Cal.1961); Oregon Auto Insurance Co. v. United States Fidelity & Guaranty Co., 195 F.2d 958 (9th Cir. 1952).

It was not error for the trial court to prorate the costs of defense.

Affirmed.

NESBETT, C. J., not participating.